Russell G. Hunt, J.
These are claims to recover compensation for the appropriation by the State from the city of 72.669 acres in fee, 7.969 acres for permanent easements, and 1.23 acres for two temporary easements, all located on the west side of Fuller Boad in the western part of the city, for the construction of Interstate Boute No. 502 (the “Northway”, so-called), Latham Section, pursuant to section 30 of the Highway Law. The takings were without the right of access to and from abutting property, except with respect to a small parcel acquired in fee on the south side of Central Avenue for the widening of State highway known as Boute No. 5, and six permanent easements. The value of the temporary easements has been agreed upon at $50, without interest, and judgment will be directed in that sum. The lands taken were vacant; the stipulated vesting date was July 1, 1959, and the several appropriations will be referred to in the singular.
The city contends that prior to the appropriation the most advantageous use of its lands, as the same lay, was for commercial and industrial purposes with an aggregate value of $1,948,-957. Included therein is the value of 2,233.58 feet of frontage along Central Avenue in the Town of Colonie, at $160 per front foot, with a 300-foot depth, for commercial purposes. The State contends, on the other hand, that the best available use of the *603 premises, as they then existed, was for residential real estate subdivision and recreational purposes except for the frontage on Central Avenue which, it is conceded, was desirable for commercial purposes with a valuation at the rate of $24,615 per acre and a front footage of $150 per foot, with a depth of 300 feet. The State’s appraisers give all the lands a “ before taking ” value of $737,868. The valuations so testified to on both sides concerned the potentialities and before any improvements were undertaken.
“ In an eminent-domain proceeding, the vital issue — and generally the only issue — is that of just compensation ” (McCandless v. United States, 298 U. S. 342, 348). So, here, the sole issue concerns the amount of the “ just compensation ” (N. Y. Const., art. I, § 7) to be paid. “ Just compensation ” has been construed to mean that the owner is entitled to the difference between the fair market value of the entire property and that which remains after the taking, including all damages to the remainder occasioned by the appropriation (Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583). In that regard, consideration must be given to the ‘ ‘ uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future ” (Boom Co. v. Patterson, 98 U. S. 403, 408; see, also, Matter of Simmons, 130 App. Div. 350, affd. 195 N. Y. 573, affd. sub nom. McGovern v. City of New York, 229 U. S. 363). The “ end rule in every condemnation proceeding is that an owner is entitled to receive the fair market value of property taken from him based on the most advantageous use to which it can be put ” (Hazard Lewis Farms v. State of New York, 1 A D 2d 923, 924); but, it is not necessary to show that the “ best use ” is an accomplished fact (Valley Streams Lawns v. State of New York, 9 A D 2d 149).
The appropriation bisected, from south to north, a tract of land of over 400 acres owned by the city and which extended from Washington Avenue and the State Thruway on the south to Central Avenue on the north, including the Six Mile Water Works, or Rensselaer Lake. This tract, with another, south of Washington Avenue and the Thruway, had been acquired over 100 years ago by the city for a water supply for the people of Albany, and, upon the city’s acquisition of a gravity supply of water from its development at Alcove, New York, the Six Mile Water Works was not used as a domestic water supply source, but it has not been abandoned as a source of a supply of water. The Water Works has had a normal yield of about 1,400,000 gallons per day, but, due to the taking, that yield has been *604 reduced by something less than 25%. Part of the reduced yield arises from the new highway construction which has disturbed the natural watershed and slope of the land, the placing of earth fill in the waterways, blocking arms thereof and reducing their width and depth. It continues to be, however, a desirable supply of water available for industrial purposes like the purposes for which the city now supplies filtered water in great quantities from the Hudson River in separate mains to a liquid carbonic company and a paper manufacturer located in the northeastern part of the city. The extensive commercial and industrial developments in the Towns of Colonie and Guilderland and along Fuller Road, within the city, adjoining the Water Works, make probable the latter’s use as a water supply for commercial and industrial purposes, and a source of revenue for the city, as planned by its representatives.
For over 100 years the New York Central Railroad Company’s main line right of way has bisected the city’s tract in east and west directions, and, along the right of way, it has owned lands adjoining the city’s on the north. Long before the appropriation herein, in the adjoining area, north and east of the city’s Water Works, the railroad company established, on its own lands, an “ industrial park.” In this area, the railroad company has catered to the needs of industry and commerce in a particular and specialized way; it subdivided its lands into lots and plots, laid out streets and constructed railroad spurs from the main line so as to serve the area. The development of the area for industrial and commercial purposes has not been limited to that sponsored by the railroad company, for on the east side of Fuller Road and along the railroad right of way there was erected a large brush factory and to the north and along Fuller Road and Central Avenue there are numerous industrial and commercial enterprises. The character of the area is shown by a transaction wherein vacant land having a frontage along Central Avenue in the Town of Colonie sold for $8,000 per acre. Within the railroad’s industrial park, vacant land sold in 1951 for as high as $10,000 for 75,200 square feet, or, at the rate of about $5,800 per acre. In 1955, sales were made at prices from $3,000 to $3,800 per acre, and one unimproved plot of 3.8 acres was sold for $50,000; another, of 4.84 acres, sold for $16,000; and in 1957 there was a sale of 3.80 acres of unimproved land for $26,500. These lands, and, others in the area, were similar to the appropriated lands, except for the streets laid out, but, as offsetting features in this latter respect, there should be considered that the railroad bisects the city’s lands and its service is available thereto, and, also, the prior *605 existence of Madison and Washington Avenues, both of which ran westerly through the lands, and that the State took the most significant parts thereof; in addition, the city’s domestic supply of water and sanitary sewers were, and, are, available at Fuller Road, the doorstep to the city’s lands. The developments which already existed in the area had a dominating influence outside their own confines and influenced the market for the land in question, and, upon the evidence, reasonable probability suggests zoning law changes would be made where necessary. This has been the approach herein (Matter of Incorporated Vil. of Garden City, 9 Misc 2d 693, affd. 4 A D 2d 783, motion for leave to appeal denied 3 N Y 2d 708; Masten v. State of New York, 11 A D 2d 370).
The expansion of the developed and existing areas, referred to above, would have been westerly, prior to the appropriations. Because of a residential development along the westerly line of the city’s lands, north of the railroad right of way and south of Central Avenue, the westerly growth for industrial and commercial purposes would have been deflected south and west to and upon the city’s lands and in and about and along the waterways — the latter, upon the evidence, a desirable adjunct.
The State’s appraisers have refused to consider the industrial and commercial character of the area in and along the railroad right of way, Fuller Road, Central Avenue and the railroad’s industrial park (excepting the Central Avenue frontage referred to), and, of course, they refused to consider, too, that the growth and changes in recent years were signs of the processes at work and the potentialities involved for increased demand for land for such purposes at an accelerated pace and in a westerly direction. Having refused to consider, weigh and give effect to the evidence of the existing facts, the changing conditions and acceleration in the growth of the area for industrial and commercial purposes, it must be concluded, therefore, that their judgment of value is not founded upon sound and reasonable hypotheses. That has been the finding herein. The most advantageous use of the city’s lands, before the appropriation, was for industrial and commercial purposes.
The appropriation has limited the future industrial and commercial expansion to the city’s remaining lands lying west of Fuller Road, east of the Northway and north of Washington Avenue. The city’s lands remaining west of the taking and north of the railroad right of way, namely, 48.858 acres, instead of having value for industrial and commercial purposes, now must be valued for residential subdivision purposes. The city lands had a frontage of 2,233.58 feet on Central Avenue, and, of *606 this, the State took a frontage of 1,429 feet (Parcel 40) and this appropriation was “ without the right of access to and from abutting property ”, thereby effectively cutting off the tract of 48.858 acres from its own direct access to Central Avenue on the north and Fuller Road on the east. The additional taking of 225 feet of Central Avenue frontage with a depth of 25 feet (Parcel 41) for the widening of State highway Route No. 5 left in the city the right of access to the public highway in front.
The large tract of 140.351 acres, also remaining in the city’s ownership after the appropriation and bounded on the east by the Northway, on the south by the State Thruway and on the west and north by lands of others, likewise, must be valued for residential purposes, but the easterly approach thereto by way of a so-called right of way, excepted to the city from the appropriation, not being considered as such. The State, by means of a reservation in the description of the taking, purportedly provided the city with a right of way under a Northway bridge to reach the tract of 140.351 acres beyond and to the west. This is shown on the taking map as having a width of 2% rods, or 41 feet. The construction map is different. The fact is that after the construction of the bridge, the right of way is but 32.375 feet wide with a height of 16 feet. The reservation further limits the right of way to “ so long as property abutting parcel No. 36 ” (being the land taken for the bridge construction) “ is in one ownership and only to an extent which will not interfere with the use of the property for Interstate Highway purposes.” Further, the right is restricted ‘ ‘ to pass vehicles under the bridge ” and “ to maintain and operate a roadway.” The reservation is not one for the free, unlimited, unrestricted and open exercise of a right of ingress and regress for all travel, by persons and otherwise. It does not unequivocally relax the State’s policy of not permitting adverse interests beneath State-owned highway structures (see Rosenberg v. State of New York, 24 Misc 2d 960). The determination is reasonable that, in fact, there was no intention on the part of the State to provide for a full, free and unrestricted right of way to reach the city’s lands on the west so as to permit their full, complete and effective development, and the appraisers on both sides who assumed to the contrary, were mistaken. ‘ ‘ The rights with which the State would thus clothe (the condemnee) seem empty indeed if they may not be effectively exercised” (Robinson v. State of New York, 3 A D 2d 326, 329). Consequently, “ the damage must be evaluated on the basis of what the State has the right to do under the terms ” of the reservation (see Spinner v. State of *607 New York, 4 A D 2d 987, 988). Since the appropriations for the permanent easements likewise restrict the rights of the city’s user thereof and of access, and have in them the power to exclude, they, too, have been valued on that basis.
In order to avoid the payment of damages for the total loss of access to the 140.351 acres (see Holmes v. State of New York, 279 App. Div. 489) the State has contended that there is access to the rear of the tract from a narrow and unimproved roadway known as Rapp Road which runs at right angles to the city’s lands, and, on the north, connects with State highway known as Route No. 5 in the Village and Town of Colonie, and, on the south, with State highway known as Route No. 20 in the Town of Guilderland. A viewing of the property (Court of Claims Act, § 12, subd. 4) discloses that the road is not suitable for heavy traffic, and, in inclement weather, is not susceptible of easy passage. As an alternative means of access, it is, to say the least, unsuitable for heavy traffic. It is inconvenient, as a means of access for light traffic. The tract of land is less accessible than before and less desirable, but, it cannot be held as a fact that access is unsuitable (Holmes v. State of New York, supra). The tract’s most advantageous use after the appropriation is for a residential subdivision.